# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

**Michelle Jackson,** on behalf of herself
and others similarly situated,

               Plaintiff,

     v.                           Civil Action No. 2:25-cv-00535-MTL

**Gen Digital Inc.,**

               Defendant.


**<u>Assessment of the Economic Benefit of Remedial Relief</u>**
**<u>in Connection with the Class Action Settlement Agreement</u>**


**Jon Haghayeghi, Ph.D.**
March 4, 2026


J. Herbert Burkman & Associates

4026 Lemmon Avenue, Suite 200

Dallas, Texas 75219

jon@burkmaneconomics.com

## ECONOMIC ASSESSMENT OF THE VALUE OF REMEDIAL RELIEF

### I. INTRODUCTION

This class action lawsuit alleges that Gen Digital Inc. ("Gen Digital" or "Defendant") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Subsequently, a class action settlement was reached on behalf of all persons throughout the United States (1) to whom Gen Digital Inc. placed, or caused to be placed, a call regarding a LifeLock or Norton account, (2) directed to a telephone number assigned to a cellular telephone service, but not assigned to a person who has or had a LifeLock or Norton account with Gen Digital Inc., (3) in connection with which Gen Digital Inc. used or caused to be used an artificial or prerecorded voice, (4) from February 19, 2021 to October 30, 2025. As part of the Settlement, Defendant has agreed to remedial relief. Specifically, Gen Digital has agreed to utilize the FCC's Reassigned Numbers Database ("RND") on a go-forward basis and will not place calls with an artificial or prerecorded voice to telephone numbers the RND shows were permanently disconnected and made available for reassignment after the date of consent or last known contact reflected in Defendant's records.[1]

The undersigned economist, Jon Haghayeghi, Ph.D., has been retained by class counsel to assess (the "Assessment") the benefits accruing to class members and to society from the remedial relief that the Settlement Agreement provides. The Assessment includes

---

[1] See Settlement Agreement, §11.9.

reviewing, analyzing, and evaluating the economic impact of the Settlement Agreement, and identifying the net benefits conferred on members of the class. Additionally, the Assessment identifies other positive externalities inuring to the favor of non-party beneficiaries and related parties. The Assessment measures the aggregate economic value of the Settlement to class members and society against the backdrop of conventionally accepted measurement methodologies extant within the discipline of economics and its sub-field, cost-benefit analysis (CBA).

It is noteworthy that the Assessment's quantitative analysis includes the monetized value of non-monetary remedial relief inherent in the Settlement Agreement. By agreeing to change its practices to avoid non-compliance with the TCPA, Defendant Gen Digital has set in motion a series of positive benefits that may be readily valued for a broad swath of society. In summary, the undersigned economist believes the Settlement Agreement has far-reaching societal effects that bestow positive economic externalities to parties beyond the scope of the Settlement Agreement.

## II. QUALIFICATIONS

Dr. Haghayeghi commenced his career in 2009 at J. Herbert Burkman & Associates, an economics consulting firm. He earned his bachelor's and master's degrees in Economics from Southern Methodist University in Dallas, Texas. In 2012, he represented the United States at the I.S.E.O. Summer School (Institute for Studies on Economics and Employment), a conference hosted by Nobel laureates in Economics in Iseo, Italy.

Dr. Haghayeghi earned his Ph.D. in Economics in 2017 from the Department of Economics at Claremont Graduate University in Claremont, California. His dissertation focused on weak-form efficiency in U.S. equity markets under the guidance of Dr. John Rutledge. During his doctoral studies, he taught courses in Corporate Finance I/II and Investment Analysis in the Department of Finance, Real Estate, and Law at California State Polytechnic University, Pomona. He also taught Microeconomics and Macroeconomics at Loyola Marymount University's Department of Economics in Los Angeles, California. Dr. Haghayeghi currently teaches a capstone course, Financial Economics and Investor Behavior, in the Department of Economics at Southern Methodist University.

Additionally, Dr. Haghayeghi has provided instruction on calculating economic damages for audiences of valuation seminars held in Las Vegas, San Diego, and Chicago in 2014, 2017, and 2021, respectively, to members of the American Rehabilitation Economics Association. From 2019 to 2022, he served as the Executive Director of the State of Alaska's Commercial Fisheries Entry Commission, an agency tasked with preserving the economic health of Alaska's fisheries. From 2022 to 2024, he held the position of Executive Director of the State of Alaska's Commission on Aging, where he was responsible for drafting the State Plan for Senior Services: FFY2024–FFY2027, which included the allocation of federal funding for the state.[2]

Dr. Haghayeghi currently serves as the Principal at Burkman & Associates and consults as a Senior Economist at Reynolds & Earle. He is a member of the National

---

[2]Alaska Statute § 47.45.230.

Association of Forensic Economists and the Dallas Association of Business Economists. He has consulted as an economist on matters pertaining to the value of economic damages for individuals and businesses, including the valuation of private and public companies, lost profits for businesses and individual business owners, loss assessments in matters ranging from breach of contract, medical malpractice, employment matters, and injury/death. He has submitted economic analyses relying on a willingness-to-pay methodology to value injunctive and remedial relief in class action matters in numerous state and federal courts, all of which have been considered without exclusion. These matters include: *Williams v. Choice Health Insurance, LLC*, No. cv-292-RAH-KFP (M.D. Ala.); *Diaz v. EXP Realty, LLC*, No. 6:18-CV-01851-PGB-EJK (M.D. Fla.); *DeShay v. Keller Williams Realty, Inc.*, No. 2022CA000457 (Nineteenth Judicial Cir., Indian River Cnty., Fla.); *Murray v. Grocery Delivery E-Services USA Inc.*, No. 19-cv-12608-WGY (D. Mass.); *Beiswinger v. West Shore Home LLC*, No. 3:20-cv-01286-HES-PDB (M.D. Fla.); and *Taylor v. Cardinal Financial Company, Limited Partnership*, No. 21-cv-2744 (M.D. Fla.). The willingness-to-pay methodology is widely accepted in determining the value of injunctive and remedial relief in class action litigation, and the methodology employed in the present Assessment is consistent with the methodology employed in those prior matters.

### III. METHODOLOGICAL FRAMEWORK

The economic assessment of the Settlement Agreement's remedial relief utilizes a market-based approach grounded in empirical data from current consumer practices. This

approach focuses on the market prices for subscription services that provide privacy protections, reflecting the actual expenditures consumers are willing to make to avoid unsolicited contacts. This data is instrumental in quantifying the economic benefits derived from the settlement, offering a tangible measure of consumer value on privacy.

The observed market prices anchor the analysis within a realistic range that reflects the expenses consumers undertake to block or limit unwanted calls. By relying on these empirically derived price points, this methodological framework ensures the Assessment is robust, reliable, and reflective of current market dynamics. This approach underlines the Assessment's credibility and supports a conservative understanding of the settlement's economic benefits.

## IV. ECONOMICS OF THE SETTLEMENT AGREEMENT

### A. Assessing the Economic Value of the Settlement Agreement

The discipline of economics provides the theoretical framework and quantitative methods central to assessing the benefits accruing to all persons affected by the Settlement Agreement. With respect to the Settlement, review and analysis have identified the benefits inuring to the class and a broad spectrum of society.

#### 1. Economic Benefits

The foremost economic advantage for consumers stems from the alteration in Gen Digital's practices and the consequent modification in conduct. By implementing changes

to utilize the FCC's Reassigned Numbers Database and discontinue placing artificial or prerecorded voice calls to reassigned numbers, the Settlement Agreement ensures that both present and prospective targeted consumers will be safeguarded from infringements on their privacy due to unsolicited prerecorded calls made by or on behalf of Gen Digital.

In a legal context, the Settlement Agreement guarantees the protection of the public's privacy from telephonic communications on behalf of Gen Digital while concurrently assuring the company that its revised calling practices will not be subjected to future legal challenges by consumers. The beneficiaries of these practice amendments can be broadly classified into three categories: 1) targeted consumers, 2) Gen Digital, and 3) society at large.

The modifications to Gen Digital's practices provide privacy assurances to consumers and alleviate any related discontent. It is acknowledged that the status quo prior to the class action lawsuit has been irrevocably transformed. Future targeted consumers will no longer need to be apprehensive about potential encroachments on their privacy and well-being. As a result, society as a whole is likely to be spared the burden of addressing grievances from any future parties who may have suffered damages due to the previous practices.

### 2. Determining Willingness-to-Pay

In order to accurately determine a justifiable aggregate value of the relief resulting from the Settlement Agreement, economists employ methodologies and procedures grounded in the field of economics, specifically within the sub-domain of CBA. When

evaluating benefits, cost-benefit analysts routinely utilize consumers' willingness-to-pay (WTP) as a means of understanding the value they place on acquiring information or eliminating undesired features that adversely impact consumer satisfaction stemming from a transaction.

The willingness-to-pay approach facilitates a direct evaluation of a spectrum of rational alternatives, enabling economists to discern the value associated with each option. In conducting this analysis, empirical data—such as subscription products available in the market—provides insights into individual willingness-to-pay with respect to telephone privacy. Market observations offer tangible evidence of consumer behaviors and preferences, giving a concrete foundation to the WTP analysis. These real-world insights ensure that the analysis is deeply rooted in actual market conditions and consumer valuation of privacy enhancements.

### 3. Valuing Privacy and the Absence of Unwanted Calls

In the realm of consumer decision-making pertaining to the expenditure on goods and services, individuals strive to optimize their satisfaction, or utility, through their acquisitions. Analogously, while choosing and procuring any product or service, consumers exhibit a willingness-to-pay for the exclusion of undesirable attributes. Cost-benefit analysis equips economists with the tools to quantify and assign value to the benefits that arise from the extent to which consumers are willing to pay for the absence of an unwanted feature – in the present case, the prohibition of unsolicited prerecorded calls to reassigned numbers.

In relation to the aforementioned practices of Gen Digital, each unsolicited phone call signifies a loss of privacy and engenders displeasure for the consumer. The central question then becomes: What is the value that consumers attribute to the absence of such undesirable action, and does a viable market exist for a product or service that addresses this demand?

Ad-blockers have become increasingly popular in recent years due to growing concerns about data privacy and security. From an economic perspective, the use of ad-blockers can be understood as a response to a market failure in the digital advertising industry, where the costs of privacy breaches and unwanted tracking are not fully borne by the companies that engage in these practices. Ad-blockers represent a mechanism for consumers to exert their preferences and push back against companies that fail to adequately protect their privacy. Additionally, the use of ad-blockers may also have implications for the revenue models of companies that rely on advertising for their business, as the prevalence of ad-blockers can limit the effectiveness of targeted advertising and force companies to explore alternative revenue streams.

### 4. Determining Value and Benefit

The value of the Settlement Agreement can be observed through the study of consumer behavior with respect to the TCPA. Willingness-to-pay reveals a range of reasonable values that represent the diversity of consumer preferences over varying periods of time. For example, products designed to stop unwanted calls that have been purchased by millions of Americans range in price from $1.99 to $7.99 per month. The Settlement

Agreement, much like these products, assists in the removal of this specific undesired feature. The known market value of such products can be used to assess the economic benefit bestowed on each class member and society as a result of the Settlement Agreement.[3]

It is the opinion of the undersigned economist, developed with a reasonable degree of economic certainty, that the estimates in this report are conservatively low. It should be noted, this analysis follows the broad assessment guidelines established by applicable economic theory and empirical analysis in determining the economic value. As reviewed above, the broad foundations of microeconomic theory and cost-benefit analysis are drawn upon to assess the reasonable value of the reformed and modified business practices and initiatives acknowledged in the parties' Settlement Agreement.

## B. Correcting Market Externalities

The TCPA is federal legislation enacted in 1991 to protect consumers from unsolicited and intrusive calling practices. The TCPA imposes restrictions on telemarketers, such as requiring their adherence to the Do Not Call registry, limiting the use of automated dialing systems, and mandating the provision of identifying information during calls. Violations of the TCPA can result in penalties and legal consequences, including class-action lawsuits.[4]

---

[3]Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007).

[4]Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 (1991).

In the context of the economic framework previously outlined, the TCPA plays a crucial role in safeguarding consumers' utility and allowing for the efficient allocation of resources. By regulating calling practices and protecting consumer privacy, the TCPA directly addresses the undesirable attributes associated with unsolicited prerecorded calls. This, in turn, increases the value of the telecommunications market for consumers, as it ensures that their preferences are respected and their privacy is maintained.

Moreover, the TCPA contributes to the proper functioning of the labor and capital markets by promoting responsible calling practices and encouraging businesses to invest in compliant communication service technologies. By deterring invasive and unwanted calling practices, the TCPA fosters a more efficient market environment where resources can be allocated in accordance with consumer preferences and regulatory standards.

In assessing the value of a resource, economists rely on facts, assumptions, and forecasts. In those rare instances when the basic facts are known and generally agreed upon, economic assessment is often straightforward. When basic facts are subject to interpretation and conflict, analysis and review are critical. When forecasts become part of the equation, any number of conflicting interpretations may arise. Assessment proceeds with the recognition that underlying premises, assumptions, and expectations are often controversial. As a result, the undersigned economist is behooved to present associated benefits to society at a presently available, conservative price level.

### 1. Statutory Value of Privacy

In evaluating the reasonableness of price levels, it is important to consider the legislative history and statutory language of any public policy that may be relevant. With respect to the TCPA, Congress acknowledged the prospective gains in societal benefit by prohibiting non-consensual telephone calls and providing for the recovery of actual monetary loss or statutory damages in the amount of $500 for each violation, whichever is greater. In the case of willful violations, the court may, in its discretion, increase the award to an amount equal to not more than three times $500, or $1,500.[5] Certainly, there are members of the class who value such protection in the amount of $500 or more.

### 2. Basis for Assessed Value of Benefit to Society

In this Assessment, a conservative, market-based approach utilizing common price points for products available to consumers is relied on. The value of such public good was recognized in the Federal Trade Commission's contest aimed at promoting technologies to block and defeat the scourge of automated calling systems in 2015, when Harvard University students won a grand prize.[6] The recipients of this award developed the most widely adopted application for blocking unwanted telephone calls in the United States and the product retails for $4.99 per month. With more than 12 million downloads and $600

---

[5] 47 U.S.C. § 227.

[6] https://www.ftc.gov/news-events/news/press-releases/2015/08/ftc-awards-25000-top-cash-prize-contest-winning-mobile-app-blocks-illegal-robocalls

million in losses prevented,[7] RoboKiller is a leading independent spam call and text blocker. Subscriptions to other products, such as Verizon Call Filter Plus ($3.99 per month), AT&T ActiveArmor Advanced ($7.00 per month), and YouMail Plus ($7.99 per month) are used by millions of customers in the United States. The prevalence of unwanted calls has demonstrated there is a clear willingness-to-pay for services that eliminate undesired, unsolicited calls.[8]

### 3. Value of the Benefit to Society

#### a. Change in Gen Digital Practices

Gen Digital has agreed to utilize the FCC's Reassigned Numbers Database on a go-forward basis and will not place calls with an artificial or prerecorded voice to telephone numbers the RND shows were permanently disconnected and made available for reassignment after the date of consent or last known contact reflected in Gen Digital's records. These changes are expected to eliminate unsolicited prerecorded calls that would otherwise be transmitted by Gen Digital to reassigned numbers. In determining the economic value of the benefits to society, the undersigned economist recognizes the role the Settlement Agreement plays in deterring future TCPA violations for both members of the class and for society at large.

#### b. Class Size

---

[7]https://www.bloomberg.com/press-releases/2023-04-04/both-robotexts-and-robocalls-increased-in-march-according-to-robokiller-insights
[8]https://www.pcmag.com/how-to/block-robocalls-and-spam-calls

The Settlement Agreement provides that Defendant will deliver to Class Counsel a list of unique telephone numbers to which Defendant placed at least one call regarding a LifeLock or Norton account during the Settlement Class Period in connection with which it may have used an artificial or prerecorded voice, and which, according to the FCC's Reassigned Numbers Database, was permanently disconnected and made available for reassignment.[9] The parties estimate that the number of likely Settlement Class Members is far fewer than the 359,789 unique telephone numbers on which the Settlement is contingent.[10] For purposes of this analysis I have been asked to assume there are 100,000 Settlement Class Members. The Settlement Class Period spans from February 19, 2021 through October 30, 2025, a period of approximately four years and eight months.

### c. Conservative Estimate of the Value of the Benefit to Society

In conservatively estimating the value that consumers place on evading unsolicited calls, this analysis selects the lowest commonly observed market price for call-blocking services from among the products listed on the Federal Communications Commission's "Call Blocking Tools and Resources" page. That product is Verizon Call Filter Plus, one of the most widely used call-blocking services in the United States, which is priced at $3.99 per month. Annualized, this conservative price point yields a willingness-to-pay of $47.88 per year ($3.99 × 12 = $47.88). The observed price anchors the analysis within a realistic

---

[9]See Settlement Agreement, §4.3–4.4.
[10]See Settlement Agreement, §4.2 ("Plaintiff and Defendant estimate that the users of the telephone numbers identified in paragraph 4.3 may fall within the Settlement Class definition, and that the number of likely Settlement Class Members is far fewer than 359,000."); see also §4.4.

range that reflects the expenses consumers are willing to undertake to block or limit such interruptions.

Applying this conservative annualized willingness-to-pay to 100,000 individuals, the estimated value of the benefit bestowed on Settlement Class Members over the next year is approximately $4,788,000, which is equal to 100,000 class members × $47.88. This figure represents a reasonable lower-bound estimate of the value of the benefit to society in this matter.

Table 1 in Appendix 1 summarizes a range of products available to consumers for the purpose of blocking unwanted calls, with annual costs ranging from a minimum of $0.55 to a maximum of $95.88.[11] Each value represents a willingness-to-pay for the benefit of not receiving unwanted cell phone calls.

## V. CONCLUSION

By accounting for the anticipated changes to Gen Digital's practices aimed at curbing TCPA violations, and utilizing a conservative willingness-to-pay price point to avoid unwanted calls, we are able to estimate the value of the benefit to society resulting from the Settlement Agreement. As reviewed herein, it is my opinion—held with reasonable economic certainty—that the economic value of the benefits bestowed on society are proportional to or exceed the value of the settlement agreement.

---

[11]The sources of all values are provided in Appendix 2.

In closing this report, the undersigned economist is available to respond to any question raised about the methods and procedures used in reaching the conclusions herein.

The above-cited appendix follows.

_____

Jon Haghayeghi, Ph.D.

# APPENDIX 1
## SUPPORTING DOCUMENTS FOR VALUING WILLINGNESS-TO-PAY

### TABLE 1
### VALUE OF PROTECTION FROM NON-CONSENSUAL TELEMARKETING CALLS:
### WILLING BUYER'S PRICE POINTS

| PRICE PER YEAR | SOURCE / SUPPORT |
|---|---|
| $0.55 | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of $0.55 to $33.21 per household per year. |
| $8.25 | Png, Ivan P.L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533. |
| $23.88 | Nomorobo Basic charges $1.99 per month for robocall blocking. https://www.nomorobo.com/ (verified Feb. 2026). |
| $33.21 | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of $0.55 to $33.21 per household per year. |
| $47.40 | TrapCall Basic charges $3.95 per month for spam call blocking and caller unmasking. https://www.trapcall.com/ (verified Feb. 2026). |
| $47.88 | Verizon Call Filter Plus charges $3.99 per month for call identification and spam blocking. https://www.verizon.com/solutions-and-services/call-filter/ (verified Feb. 2026). |
| $50.04 | Nomorobo Max charges $4.17 per month ($49.99/year) for enhanced robocall blocking per device. https://www.nomorobo.com/ (verified Feb. 2026). |
| $59.88 | RoboKiller charges $4.99 per month ($89.99/year) for robocall and spam text blocking. https://www.robokiller.com/ (verified Feb. 2026). |
| $84.00 | AT&T ActiveArmor Advanced charges $7.00 per month for call blocking, spam filtering, identity monitoring, and up to $1 million in identity theft insurance. https://www.att.com/security/security-apps/ (verified Feb. 2026). Price increased from $3.99 to $7.00 per month effective February 18, 2026. |
| $95.88 | YouMail Plus is priced at $7.99 per month for visual voicemail and robocall blocking. https://www.youmail.com/ (verified Feb. 2026). |

Measures of Central Tendency:
Mean: $45.10
Median: $47.64

# JON HAGHAYEGHI
4026 Lemmon Ave.
Dallas, TX 75219

## EDUCATION

**CLAREMONT GRADUATE UNIVERSITY**                           **Claremont, CA**
**Doctor of Philosophy: Economics**                                   **2013-2017**
Dissertation: *Weak form Efficiency: Calendar Anomalies in U.S. Equity Markets*
- Graduate Fellow | Research Assistant | Omicron Delta Epsilon Honor Society

**SOUTHERN METHODIST UNIVERSITY**                              **Dallas, TX**
**Master of Arts: Applied Economics**                                 **2011-2013**
- Teaching Assistant | Omicron Delta Epsilon | GRE: 790/800

**SOUTHERN METHODIST UNIVERSITY**                              **Dallas, TX**
**Bachelor of Science: Economics**                                    **2006-2010**
- Recipient of Embry Engineering and University Scholarships

## PROFESSIONAL EXPERIENCE

**BURKMAN & ASSOCIATES: ECONOMIC RESEARCH**                    **Dallas, TX**
**Principal**                                                         **2009-Present**
- Provide expert testimony and economic analysis that withstands rigorous legal scrutiny
- Prepare and defend valuations in civil matters across Local, State, and Federal courts including personal injury, wrongful death, breach of contract, asset valuation, and lost profits.
- Construct and defend valuations to determine the fair market value of ownership and beneficial interest in trust assets including bonds, private companies, and public companies - factoring dividends, taxes, and capital gains
- Use relative value and discounted cash flow valuations to determine the fair market value of $70 million private healthcare information technology company that provided co-pay management services to non-profit organizations
- Evaluate the economic benefit to society of class-action settlement agreements in matters involving consumer privacy such as the Telephone Consumer Privacy Act

**SOUTHERN METHODIST UNIVERSITY**                              **Dallas, TX**
**Professor: Department of Economics**                                **2025-Present**
- Instruct *Financial Economics and Investor Behavior* for seniors graduating in Economics

**CALIFORNIA STATE POLYTECHNIC UNIVERSITY**                    **Los Angeles, CA**
**Adjunct Professor: College of Business Administration**             **2014-2017**
- Taught 20+ undergraduate sections of Corporate Finance I and II, and Investment Analysis

**LOYOLA MARYMOUNT UNIVERSITY**                                **Los Angeles, CA**
**Adjunct Professor: Department of Economics**                        **2017**
- Designed curriculum and instructed sections of Principles of Economics covering microeconomics and macroeconomics

**JON HAGHAYEGHI**
4026 Lemmon Ave.
Dallas, TX 75219

**STATE OF ALASKA**                                                    **Juneau, AK**
**Executive Director: Alaska Commission on Aging**                      **2022-2024**
*The executive director of the commission shall (1) formulate a comprehensive statewide plan that identifies the concerns and needs of older Alaskans and present that plan to the commission; (2) administer, with the approval of the commissioner of health and social services, federal programs subject to state control as provided under 42 U.S.C. 3001 - 3058ee (Older Americans Act), as amended; and (3 administer, with the approval of the commissioner of health and social services,  state programs as provided under AS 47.65. (AS 47.45.230)*
- Oversaw the preparation and execution of the State Plan for Senior Services: FY24-FY27
- Managed agency personnel, budget, and carried out the duties of the commission

**Executive Director: Commercial Fisheries Entry Commission**          **2019-2022**
*Responsible for and has authority over the internal administrative and personnel practices and procedures of the commission. (AS 16.43.020(b))*
- Provided direction to the research, adjudications, data processing, and licensing teams
- Published a report on the indicators of economic health across Alaska's Limited Fisheries
- Oversaw day-to-day operations to improve, streamline, and automate internal processes
- Prepared external presentations and compiled the agency annual reports
- Responsible for budgeting, accounting, staff payroll, and other financial activities
- Testified before legislature: House Fisheries Committee and Senate Finance Subcommittee
- Served as Alaska Executive Branch Ethics Act Designated Ethics Supervisor

**Accountant IV: Division of Finance**                                  **2019**
- Provided fund-level accounting for the State of Alaska
- Provided assistance and guidance to the Department of Education and Early Development, University of Alaska, and Department of Natural Resources

**5C LAUNDRY**                                                         **Claremont, CA**
**Owner and Founder (Sold)**                                            **2013-2020**
- Designed and implemented laundry and dry-cleaning delivery service for undergraduates of the Claremont Colleges
- Built the company website including content, front end registration, back-end billing, and business policies
- Hired undergraduates to build iOS app, manage operations, expand service, and maintain 20-30% CAGR in revenue

**SABRE HOLDINGS**                                                     **Krakow, Poland**
**Business Analyst Internship**                                         **Summer 2008**
- Selected as business analyst for SMU's first international engineering internship completed with the Air Availability team at Sabre
- Optimized the exploration of daily data to build detailed reports regarding patterns and trends within airline reservations

# J. HERBERT BURKMAN & ASSOCIATES
## E C O N O M I C S   R E S E A R C H

### RECORD OF EXPERT TESTIMONY

**Jon Haghayeghi, PH.D.**
**ECONOMIST**

**4026 Lemmon Avenue**
**Suite 200**
**Dallas, Texas 75219**

**T  214.435.9323**
**F  214.521.5690**

jon@burkmaneconomics.com

Jon Haghayeghi, Ph.D.
Expert Testimony Record
Page 2

## EXPERT TESTIMONY RECORD

### Jon Haghayeghi, Ph.D.

The following is a list of cases in which Dr. Haghayeghi has offered testimony as an expert witness in economics in deposition, trial, or hearing before a judge, jury, arbitrator, or mediator.

The information is arranged in the following format:

1. **Style of case**
2. **Case number**
3. **Court number and location**
4. **Attorney(s) representing the plaintiff(s)**
5. **Attorney(s) representing the defendant(s)**
6. **Form of testimony and date**
7. **Type of case**

**2021**

1. *Clayten Hearrell and Melissa Hearrell, Individually and as friends and natural parents of Braeden M. Hearrell, a minor, Plaintiffs vs. Children's Health Clinical Operations f/k/a Children's Medical Center of Dallas d/b/a Children's Medical Center Dallas, the University of Texas Southwestern Medical Center and Allergan Inc, Defendants.*
2. Cause No. CC-19-01510-D.
3. United States in the County Court, Dallas County, Texas.
4. Plaintiff's attorney: Alex Klein, Klein Law Firm, Houston, Texas.
5. Defendants' attorneys: Joel J. Steed, Steed Dunnill Reynolds Baily Stephenson, LLP, Houston, Texas and Michael H. Bernick, Kenneth E. Broughton, Sonja Weissman, Reed Smith, LLP, Houston Texas.
6. Deposition testimony (June 3, 2021).
7. Economic loss assessments in a medical malpractice case involving a minor.

1. *James B. Chapman, M.D., Claimant v. HealthTexas Provider Network, Respondent.*
2. Arbitration No. 01-19-0001-7346.
3. American Arbitration Association, in and for Dallas, Texas.
4. Plaintiff's attorney: Mike Manktelow and Bill Baily, Kish, Manktelow, and Baily, PC.
5. Defendants' attorneys: Veronika Portillo Kendrick, Jeff Cody, Norton Rose Fulbright US LLP.
6. Deposition testimony (June 30, 2021).
7. Economic loss of benefits resulting from breach of contract.

Jon Haghayeghi, Ph.D.
Expert Testimony Record
Page 3

1. *Mark Rakowski, Plaintiff v. Lennox International, Defendant.*
2. Civil Action No. 4:19-cv-00883-ALM-Jury.
3. United States District Court for the Eastern District of Texas, Sherman Division.
4. Plaintiff's attorney: Brian Sanford, David Norris, Sanford Firm.
5. Defendants' attorneys: Brian Jorgensen, Victoria Bliss, Jones Day Law Firm.
6. Deposition testimony (August 31, 2021).
7. Economic damage assessment resulting from age discrimination.

1. *Mark Rakowski, Plaintiff v. Lennox International, Defendant..*
2. Civil Action No. 4:19-cv-00883-ALM-Jury.
3. United States District Court for the Eastern District of Texas, Sherman Division.
4. Plaintiff's attorney: Brian Sanford, David Norris, Sanford Firm.
5. Defendants' attorneys: Brian Jorgensen, Victoria Bliss, Jones Day Law Firm.
6. Trial testimony (December 10, 2021).
7. Economic damage assessment resulting from age discrimination.

**2022**

1. *Will Ewing, Plaintiff  v. McLane Company, Inc., Defendant.*
2. Judicial Workplace Arbitration, No. 30189-A 2019.
3. United States County Court, Dallas, Texas
4. Plaintiff's attorney: Evan Lane Shaw, Law Offices of Van Shaw, Dallas, Texas 78201.
5. Defendant's attorney: Mark S. Scuddder, Law Firm of Quilling, Selander, Lownds, Winslett and Moser, Dallas, Texas 75201.
6. Deposition testimony (April 18, 2022).
7. Assessing loss of earning capacity following an injury; assessing the present value of life care plan.

1. *James B. Chapman, M.D., Claimant v. HealthTexas Provider Network, Respondent*
2. Arbitration No. 01-19-0001-7346
3. American Arbitration Association, in and for Dallas, Texas.
4. Plaintiff's attorney: Mike Manktelow and Bill Baily, Kish, Manktelow, and Baily, PC.
5. Defendants' attorneys: Veronika Portillo Kendrick, Jeff Cody, Norton Rose Fulbright US LLP.
6. Arbitration testimony (May 10, 2022).
7. Economic loss of benefits resulting from breach of contract.

Jon Haghayeghi, Ph.D.
Expert Testimony Record
Page 4

1. *Rebecca Ditmarr, Plaintiff v. 3M Company, Defendant.*
2. Civil Action No. Case 6:21-cv-00043-H.
3. United States District Court Northern District of Texas San Angelo Division.
4. Plaintiff's attorney: Christine Neill, Legler, Cole, PLLC.
5. Defendants' attorney: Brandon Strey, Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
6. Deposition testimony (July 6, 2022).
7. Economic loss assessment resulting from age discrimination.

1. *Mary St. Clair, Plaintiff, v. Jason Williams, M.D., Defendant.*
2. Civil Action No. 471-02172-2021.
3. United States District Court 471st Judicial District.
4. Plaintiff's attorney: Stephanie Sherman, Sherman Law.
5. Defendants' attorney: Jessica Eaton, Jeffrey Ryan, Chamblee Ryan.
6. Deposition testimony (August 23, 2022).
7. Economic loss assessment resulting from medical malpractice.

1. *Zachary Cook, Plaintiff v. Aimbridge Hospitality, LLC, et al, Defendants.*
2. Civil Action No. 401-03956-2018.
3. United States District Court of Colleen County, Texas, 401st Judicial District.
4. Plaintiff's attorney: Marc C. Tecce, Law Offices of Marc Tecce; Thomas Shaw, Law offices of Thomas Shaw, P.C.
5. Defendant's attorney: Michael A. Miller, Scott D. Greener, Miller Knauff Law Firm
6. Deposition testimony (September 29, 2022).
7. Economic loss of past earnings resulting from poisoning during work-travel.

1. *Zachary Cook, Plaintiff v. Aimbridge Hospitality, LLC, et al, Defendants.*
2. Civil Action No. 401-03956-2018.
3. United States District Court of Colleen County, Texas, 401st Judicial District.
4. Plaintiff's attorney: Marc C. Tecce, Law Offices of Marc Tecce; Thomas Shaw, Law offices of Thomas Shaw, P.C.
5. Defendant's attorney: Michael A. Miller, Scott D. Greener, Miller Knauff Law Firm
6. Trial testimony (December 2, 2022).
7. Economic loss of past earnings resulting from poisoning during work-travel.

**2023**

1. *Abigail Ornelas Individually and on Behalf of the Estate of Saul Ornelas Ma Refugio Medoza, and Catarino Ornelas, Plaintiffs vs. Kingsley Constructors, Inc., et al, Defendants.*
2. Cause No. 20-12-23788-CVR.
3. United States District Court, Reeves County, Texas, 143rd Judicial District.
4. Plaintiff's Attorney: Pedro Leyva, David Glasheen, Glasheen, Valles, & Inderman.
5. Defendant's attorney: Francisco R. Villareal, Garcia & Villareal; William Berry, Cotton Bledsoe, Tighe, & Dawson, PC.
6. Deposition testimony (August 28, 2023).
7. Economic loss of household support in a matter of wrongful death.

Jon Haghayeghi, Ph.D.
Expert Testimony Record
Page 5

**2025**

1. *Leila Kinsey, Plaintiff v. Ben E. Keith Company, Ben E. Keith, and Diego Mejia, Defendants*
2. Cause No. CC-22-02241-D.
3. County Court at Law No. 4, Dallas County, Texas.
4. Plaintiff's Attorney: Charlie Waters, Law Offices of Charlie Waters.
5. Defendant's Attorney: Craig H. Myers, Fee, Smith, Sharp & Vitullo LLP.
6. Deposition testimony (February 12, 2025).
7. Economic loss of future earnings in a matter of injury.

1. *Dakota Schumacher, Plaintiff v. Pattar Transport, Inc. and Mark Olin McMurray, Defendants*
2. Cause No. 4:23-cv-01136.
3. United States District Court, Eastern District of Texas, Sherman Division.
4. Plaintiff's Attorneys: J. Robert Miller Jr., Miller Copeland, LLP; Emily G. Copeland, Miller Copeland, LLP; Ron C. McCallum, Ron C. McCallum & Associates, PLLC.
5. Defendant's Attorneys: Michael Q. Roos, Wood Smith Henning & Berman, LLP; Daniel J. Paret, Wood Smith Henning & Berman, LLP.
6. Deposition testimony (March 17, 2025).
7. Present value of future medical care needs following an injury.

1. *Terry Johannsen and Shawna Johannsen, Plaintiffs v. Stonegate Contractors, LLC, James Dlabaj Sr., James Ray Dlabaj Jr., and Antonio Torres, Defendants*
2. Cause No. CC-23-07905-B.
3. United States County Court, Dallas County, Texas.
4. Plaintiff's Attorney: Evan Lane (Van) Shaw, Shaw Welch Powell; David J. Welch, Shaw Welch Powell; Jeremy B. (Beau) Powell, Shaw Welch Powell.
5. Defendant's attorney: Aaron Burke, Burke Bog; Kathleen Cruz, Burke Bog; Jude Hickland, Burke Bog.
6. Deposition testimony (April 9, 2025).
7. Economic loss of future earnings in a matter of workplace injury.

1. *Chad Hare, Individually, as Next Friend of M.H., a Minor, and as Representative of the Estate of Roselyn Jimenez, Plaintiffs v. Jesse Alan Budine and Firebird Bulk Carriers Inc., Defendants*
2. Cause No. 2024-32838.
3. District Court of Harris County, Texas, 234th Judicial District.
4. Plaintiffs' Attorney: William H. Stout, Sutliff & Stout, PLLC, Houston, Texas.
5. Defendants' Attorneys: Marc B. Johnson, BairHilty, P.C., Houston, Texas; Robert L. Ramey, Ramey Chandler Schein, P.C., Houston, Texas.
6. Deposition testimony (October 10, 2025).
7. Economic loss assessments in a wrongful death and personal injury matter, including loss of financial support, loss of household services, and loss of earnings.